UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __3/19/26__

STEPHANIE M. REVERON,

        Plaintiff,

    -against-

FOREVER 21 RETAIL INC., et al.,

        Defendants.

24-CV-6210 (VEC) (BCM)

**REPORT AND
RECOMMENDATION TO THE
HON. VALERIE E. CAPRONI**

**BARBARA MOSES, United States Magistrate Judge.**

Plaintiff Stephanie M. Reveron, proceeding pro se, alleges that defendants Walmart, Inc. (Walmart) and Authentic Brands Group, LLC (ABG) are liable to her for (1) trademark infringement under § 32(1) of the Lanham Act, 15 U.S.C. § 1114(1); (2) unfair competition and false designation of origin under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (3) common law trademark infringement and unfair competition under New York law; and (as to Walmart only) (4) contributory trademark infringement. *See* Second Amended Complaint (SAC) (Dkts. 84 to 84-3) ¶¶ 284-301. Specifically, plaintiff claims that five t-shirts sold by Walmart, and one pullover sweater sold by ABG, through its Forever 21 brand, infringe plaintiff's trademarks LES NYC®, LES NEW YORK®, LOWER EAST SIDE™, LOWER EAST SIDE NYC™, and LOWER EAST SIDE NEW YORK CITY™.

Now before me for report and recommendation (*see* Dkt. 6) are the motions of Walmart (Dkt. 96) and ABG (Dkt. 127) to dismiss the claims against them pursuant to Fed. R. Civ. P. 12(b)(6). After careful review of the file, I conclude, for the reasons set forth below, that ABG's motion to dismiss should be granted in full and that Walmart's motion should be granted in part and denied in part.

## I.    BACKGROUND

The facts summarized herein are drawn from the SAC and its attachments, together with plaintiff's declarations in opposition to the Walmart and ABG motions to dismiss. *See* Pl. Walmart Decl. (Dkt. 116); Pl. ABG Decl. (Dkt. 138). As explained in Part II(A) below, the Court may consider any factual allegations that a pro se plaintiff makes in her opposition declarations as part of her pleading, provided that they are not inconsistent with the pleading itself.

### A.    Factual Background

#### 1.    The Marks

Since at least 2022, plaintiff Reveron has operated a clothing business, through which she markets and sells headwear, t-shirts, sweaters, and hoodies bearing various marks that appear to refer to the Lower East Side neighborhood of New York City, including, as relevant here, LES NYC®, LES NEW YORK®, LOWER EAST SIDE™, LOWER EAST SIDE NYC™, and LOWER EAST SIDE NEW YORK CITY™ (collectively, the Marks). SAC ¶¶ 1, 4-5, 62-65. Plaintiff offers her products through a website, an Instagram account, her own retail store "in Lower Manhattan, New York," retail stores in other states, and at pop-up events. *Id.* ¶¶ 4, 67-68 & Ex. I. Additionally, she offers clothing design, manufacture, and printing services to other companies. *Id.* ¶ 80.

In addition to the five Marks directly at issue here, plaintiff "owns and has long-standing common law and trademark rights in the marks LES™ and LOYALTY EQUALS STRENGTH™." SAC ¶ 4. She alleges that the letters LES have a "dual meaning," functioning as an acronym both for LOWER EAST SIDE, "a brand and place associated with the origin of [her] clothing products," and for LOYALTY EQUALS STRENGTH, "a source identifier for Plaintiff's brand." *Id.* ¶ 5. She asserts that she and her predecessor, Robert G. Lopez (discussed below) have consistently used these two marks, along with LES NYC™, LOWER EAST SIDE™, and other

2

"related" marks, "in conjunction with each other to form a unique brand identity." *Id*. ¶ 6.[1] By 2017, Lopez "began offering licensing opportunities to various third-party clothing retailers under his LES NYC™, LOWER EAST SIDE™ and/or LES™ marks." *Id*. ¶ 57.

Reveron "acquired ownership" of the LES NYC® and LOWER EAST SIDE™ marks from Lopez in May 2022, "via an assignment of trademark rights," which "granted [her] the goodwill in the marks and the rights to enforce the marks against any infringers." SAC ¶ 62. Reveron "independently owns and uses the marks" LES NEW YORK®, LOWER EAST SIDE NYC™, and LOWER EAST SIDE NEW YORK CITY™, among others, in connection with the sale and promotion of clothing items. *Id*. ¶ 63. Like her predecessor, Reveron continues to use the letters LES to refer both to the Lower East Side of Manhattan and to the coined phrase LOYALTY EQUALS STRENGTH™. *Id*. ¶¶ 5, 63.

LES NYC® was originally registered with the United States Patent and Trademark Office (USPTO) to Lopez under United States Trademark Registration No. 4,549,880 on June 17, 2014. *See* SAC ¶ 81 & Ex. K (USPTO Reg. 4,549,880) at 1-4. An assignment of ownership to plaintiff was documented by the USPTO on January 25, 2023. *See* USPTO Reg. 4,549,880 at 3. The LES NYC® mark "consists of standard characters without claim to any particular font style, size, or color" and applies to baseball caps and hats, hooded sweatshirts, and t-shirts. *Id.* at 2.

LES NEW YORK® was registered with the USPTO on October 29, 2024, two months after plaintiff commenced the instant case. *See* SAC ¶ 82 & Ex. L (USPTO Reg. 7,551,816). The

---

[1] The SAC does not expressly identify the company through which plaintiff sells her clothing. Nor does it clearly name her brand(s). *See*, *e.g*., SAC ¶¶ 5-8, 69, 87, 96. For ease of reference, I refer to plaintiff's business as LES Clothing Co., which is how it is identified on her website, *see* https://perma.cc/T359-AUPC; in the "online and print magazine advertisements" reproduced in her pleading, *see* SAC ¶ 6; and (with a minor variation) in litigation brought by Lopez to enforce his trademark rights. *See Lopez v. Gap, Inc.*, 883 F. Supp. 2d 400, 408 (S.D.N.Y. 2012) (noting that Lopez "started doing business as L.E.S. Clothing Co. in 1999").

LES NEW YORK® mark "consists of standard characters without claim to any particular font style, size or color" and applies to apparel, including hats, t-shirts, and hoodies. USPTO Reg. 7,551,816.

Plaintiff concedes that the remaining Marks are not federally registered. *See* Pl. Walmart Decl. ¶¶ 21, 25; Pl. ABG Decl. ¶¶ 24, 28. As to LOWER EAST SIDE™, plaintiff alleges that she "is the current owner of New York State Trademark Registration No. R32849." SAC ¶ 86. She adds that non-party Payless Shoesource Worldwide, Inc. (Payless) owns the federally registered trademark LOWER EAST SIDE®, for "footwear," under United States Trademark Registration No. 2,416,437. *Id.* ¶ 87 & Ex. P. Plaintiff claims that her predecessor had a "Co-Existence Agreement with Payless. . . for the mark LOWER EAST SIDE®, which allows the parties to co-exist in the marketplace and both utilize the LOWER EAST SIDE™ mark but limits Payless's use of the mark to 'footwear' and grants and/or limits Plaintiff's and her predecessor's rights . . . [to] all other forms of clothing that exclude footwear." *Id.* ¶ 88. Plaintiff does not attach the Co-Existence Agreement.

As to LOWER EAST SIDE NYC™, plaintiff alleges that she "is the owner of New York State Trademark Registration No. R34382," SAC ¶ 85 & Ex. O (NY Reg. R34382), which was registered on June 24, 2024, more than two months prior to the filing of this case. "The mark is comprised of the words LOWER EAST SIDE NYC without claim to any particular font, style, or design" and applies to "[c]lothing, namely: t-shirts, sweaters, hoodies, and headwear." NY Reg. R34382. The registration lists June 10, 2018 as the date of first use. *Id.*

Lastly, as to LOWER EAST SIDE NEW YORK CITY™, plaintiff alleges that she "is the owner of United States Trademark Serial No. 98/445,032 . . . that was approved for registration by the United States Patent and Trademark Office on July 9, 2024." SAC ¶ 83 & Ex. M (USPTO App.

4

98/445,032). However, the corresponding "registration" document, which plaintiff attaches as Exhibit M to the SAC, shows only that plaintiff has a "pending trademark application," which she filed on March 15, 2024, and which the USPTO published for opposition on August 13, 2024. USPTO App. 98/445,032 at 1, 3-4. As of the date of this Report and Recommendation, the application is opposed and pending.

Plaintiff claims exclusive rights in the Marks in connection with the sale and promotion of apparel, including hats, t-shirts, and sweatshirts. SAC ¶ 79. She further asserts that her clothing brand "enjoy[s] a superlative reputation in the apparel industry," *id*. ¶ 74, and that the Marks "have all acquired 'secondary meaning' in the marketplace in connection with the sale and offering of clothing goods." *Id*. ¶ 69; *see also id.* ¶ 7 (alleging that the "primary geographical significance" of the Marks has been eliminated such that they are now "viewed and perceived as brand names associated with Plaintiff and/or Plaintiff's predecessor").

### 2.    Walmart's T-Shirts

Defendant Walmart is a Delaware corporation selling goods in stores and through its website. SAC ¶¶ 38, 109-111. Reveron alleges that Walmart promotes, sells, and offers, either directly or indirectly through third-party sellers, t-shirts bearing plaintiff's LES NYC®, LES NEW YORK®, LOWER EAST SIDE™, LOWER EAST SIDE NYC™, and LOWER EAST SIDE NEW YORK CITY™ marks. *Id*. ¶ 112. Plaintiff identifies five such t-shirts. *See id.* Ex. R (Dkt. 84-3 at ECF pp. 30-34). One of the accused t-shirts (Walmart T-Shirt 1) bears the text "LES NYC" in block letters on the front of the shirt, with "LES" on the first line and "NYC," in the same size font, directly below. *See id.* at ECF p. 30. Walmart T-Shirt 2 bears the phrase "LOWER EAST SIDE" above a horizontal line, followed by "NYC," which appears below the line. *Id*. at ECF p. 31. Walmart T-Shirts 3, 4 and 5 all bear the three-word phrase "LOWER EAST SIDE" in large letters

on the front of the shirt, with "LOWER" on the top line, "EAST" on the second, and "SIDE" on the third, but in varying colors and fonts. *Id*. at ECF pp. 32-34.

**Walmart T-Shirts 1-5**



SAC Ex. R at ECF pp. 30-34 (hereinafter Walmart T-Shirts 1-5).

Plaintiff appears to allege that all of the accused Walmart products infringe all five of her Marks. *See* SAC ¶¶ 112, 116-23. As an example, she contrasts Walmart T-Shirt 1 with one of her

t-shirts, which also bears the text "LES NYC" in block letters on the front of the shirt, with "LES" on the first line and "NYC," in the same size font, directly below:



Defendant Walmart's LES NYC® T-Shirt          Plaintiff's LES NYC® T-Shirt

SAC at 42.

These two t-shirts, plaintiff alleges, are "almost identical." SAC ¶ 115. More generally, plaintiff alleges (without specifying any particular shirt) that "[t]he design elements of Defendant Walmart's clothing products . . . are evocative of the design elements of Plaintiff's clothing products bearing the LES™, LES NYC®, LES NEW YORK®, LOWER EAST SIDE NEW YORK CITY™, LOWER EAST SIDE NYC™, and LOWER EAST SIDE™ marks," with "similar fonts, size, print location, and overall aesthetic, creating an impression that evokes the Plaintiff's clothing products bearing the identical marks." *Id*. ¶ 116.

### 3. ABG's Pullover

Defendant ABG is a Delaware limited liability company that "acquired Forever 21's intellectual property and business assets out of bankruptcy." SAC ¶¶ 36, 91-92. ABG owns, manages, controls, and operates the Forever 21 retail clothing stores and website. *Id*. ¶¶ 36, 92-93.

Plaintiff alleges that ABG, through its Forever 21 brand, markets and sells a pullover sweater (the Forever 21 Pullover) that bears plaintiff's LOWER EAST SIDE NEW YORK CITY™ mark and is "nearly identical" to a pullover hoodie sold by plaintiff. *Id.* ¶ 97. Both garments display the phrase "LOWER EAST SIDE" in small block capitals on the front of the garment, below which is the phrase "NEW YORK CITY" in larger block capitals. Below that, in even larger block capital letters, the Forever 21 Pullover displays the initials "NY," whereas plaintiff's hoodie displays "NYC." Additionally, the Forever 21 Pullover has a fourth line of text on the front, reading, in small block capitals, "ATHLETICS UNITED CLUB," whereas plaintiff's hoodie appears to bear three smaller lines of block text near the left shoulder, set diagonally, reading, "LOWER EAST SIDE/NEW YORK CITY/NYC."

| **Defendant Forever 21's Pullover Sweater** | **Plaintiff's Pullover Hoodie Sweater** |
| --- | --- |
|  |  |
| Forever 21 Women's New York City Graphic Pullover | |

SAC ¶ 97 & Ex. Q (Dkt. 84-3 at ECF p. 38).[2] Plaintiff appears to allege that the Forever 21 Pullover infringes all five of the Marks. *Id.* ¶¶ 94-95, 97, 99-105, 107.

---

[2] It is not clear from the SAC whether the three smaller diagonal lines of text near the left shoulder of plaintiff's hoodie are printed on the garment itself or affixed to the garment as a hangtag or sticker.

### B.    Procedural History

Reveron commenced this action on August 16, 2024, by filing a 67-page complaint against Walmart, Forever 21 Retail, Inc. (Forever 21), Depop, Inc. (Depop), and John Does 1-2. (Dkt 1.) On November 13, 2024, she filed a 205-page First Amended Complaint adding nine new corporate defendants: Boohooplc.com, Inc. (BooHoo), Hardy Way LLC d/b/a Ed Hardy (Ed Hardy); J. Crew, Inc. (J. Crew); Shop PO LLC (Shop PO); Kung Pow Planet, Inc. (Fried Rice); ASOS US Sales, LLC (ASOS); Pacific Sunwear of California LLC d/b/a Pac Sun (Pac Sun); PlanetArt LLC (PlanetArt); Aktieselskabet AF 21 November 2001 d/b/a Bestseller USA (Bestseller USA); and Timberland Footwear and Clothing LLC (Timberland). (Dkt. 17.) On March 11, 2025, with leave of Court (*see* Dkt. 69), she filed the 206-page SAC, in which she dropped PlanetArt, added ABG, and replaced Forever 21 with F21 OPCO, LLC (F21).

To date, plaintiff has voluntarily dismissed her claims as against all defendants save three: Walmart, ABG, and F21. *See* Dkts. 73-75, 90, 94, 95, 109-111. On April 2, 2025, F21 notified the Court by letter (Dkt. 108) that it has a pending Chapter 11 bankruptcy case in the United States Bankruptcy Court for the District of Delaware, docketed at *In re: F21 OPCO, LLC, et al.*, No. 25-10469 (MFW) (Bankr. D. Del.). Accordingly, this action was automatically stayed as against defendant F21 pursuant to 11 U.S.C. § 362(a).

As against the remaining two defendants, Walmart and ABG, Reveron asserts four causes of action: for trademark infringement under § 32(1) of the Lanham Act, 15 U.S.C. § 1114(1); unfair competition and false designation of origin under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); common law trademark infringement and unfair competition under New York law; and (as to Walmart only) contributory trademark infringement. *See* SAC ¶¶ 284-301.

On April 1, 2025, Walmart filed a motion to dismiss all of plaintiff's claims against it pursuant to Fed. R. Civ. P. 12(b)(6), supported by a memorandum of law. *See* Walmart Mem. (Dkt. 98). Walmart argues that, as to the Marks that are not federally registered, plaintiff fails to sufficiently plead that they have acquired secondary meaning in the consumer market – that is, that consumers associate the Marks primarily with plaintiff's brand rather than with the Lower East Side neighborhood in general. *See id*. at 23-29. Additionally, Walmart contends that its use of the Marks is geographically descriptive, constituting fair use. *See id.* at 16-22.

On May 12, 2025, ABG filed its motion to dismiss, supported by a memorandum of law (ABG Mem.) (Dkt. 131), and the declaration of its attorney Julia L. Mazur (Dkt. 129) with accompanying exhibits. In large part, ABG adopts the arguments raised by Walmart. *See* ABG Mem. at 2-8. ABG adds that "while the claims against [it] appear to be based on a perceived relationship between ABG and F21, and ABG disputes that it had any involvement whatsoever in the design, manufacture, distribution, sale, or promotion of the Pullover, ABG does not contest herein these allegations against it solely for the purpose of this Motion." ABG Mem. at 1 n.1.

On April 28, 2025, plaintiff filed her memorandum in opposition to the Walmart motion to dismiss, *see* Pl. Walmart Opp. (Dkt. 115), accompanied by her opposition declaration, and on May 27, 2025, she filed a substantially similar memorandum in opposition to the ABG motion, *see* Pl. ABG Opp. (Dkt. 137), accompanied by her second opposition declaration. Plaintiff argues that she has sufficiently alleged that consumers primarily associate the Marks with her brand rather than the Lower East Side neighborhood, and that defendants' fair use defense is "frivolous," particularly in light of the recent decision in *Reveron v. Spot Int'l, Inc.*, 2025 WL 934356 (S.D.N.Y. Mar. 27, 2025), where the court "ruled that use of the marks such as LES NYC® and LOWER EAST SIDE™ on garments was not descriptive but instead functioned as trademarks identifying source."

10

Pl. Walmart Opp. at 2.[3] Walmart filed its reply brief on May 16, 2025 (Walmart Reply) (Dkt. 132), and ABG filed its reply brief on June 5, 2025 (ABG Reply) (Dkt. 140).

## II.    Legal Standards

### A.    Pro Se Plaintiffs

Ordinarily, a federal court must construe a complaint filed by a pro se plaintiff "liberally, reading it with special solicitude and interpreting it to raise the strongest claims that it suggests." *J.S. v. T'Kach*, 714 F.3d 99, 103 (2d Cir. 2013) (quoting *Harris v. City of New York*, 607 F.3d 18, 24 (2d Cir. 2010)). However, pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law." *Maisonet v. Metro. Hosp. & Health Hosp. Corp.*, 640 F. Supp. 2d 345, 348 (S.D.N.Y. 2009) (quoting *Boddie v. N.Y. State Div. of Parole*, 285 F. Supp. 2d 421, 426 (S.D.N.Y. 2003)). A pro se plaintiff, like a counseled plaintiff, "must state a plausible claim for relief." *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013). Moreover, where – as here – a pro se litigant has significant experience in enforcing her rights through the courts,[4] she may be

---

[3] Plaintiff's characterization of *Spot Int'l* is not entirely accurate. In that case, the Hon. Jessica Clarke, United States District Judge, adopted the recommendation of the Hon. Gabriel Gorenstein, United States Magistrate Judge, who assumed without deciding that "Reveron's alleged trademarks are enforceable and are owned by Reveron," and then analyzed "each of the accused products" to see if defendants were entitled to the fair use defense because of the way in which *they* used words and phrases such as "Lower East Side," "L.E.S.," "LES," and "Lower East Side New York City" on *their* accused products. *Reveron v. Zumiez, Inc.*, 2024 WL 5131627, at *7 (S.D.N.Y. Dec. 17, 2024) (*Zumiez I*), *adopted sub nom. Reveron v. Spot Int'l, Inc.*, 2025 WL 934356 (S.D.N.Y. Mar. 27, 2025). As a result of that analysis, Judge Gorenstein concluded – and Judge Clarke agreed – that defendants New Balance, ALD, StockX, TSI, Snyder, Hanesbrands, Zazzle, TP Apparel, Cafepress, GRG, Exit9, CSB, and Gutter Bar used these words and phrases in a descriptive sense, rather than to indicate the source of the product, and were therefore entitled to the fair use defense, *id*. at *15, but that plaintiff adequately alleged infringement claims against defendants Amazon, Etsy, and Redbubble. *Id*.

[4] The present action is the third trademark infringement action filed by plaintiff Reveron in the Southern District of New York. *See Zumiez I*, *supra*; *Reveron v. Spreadshirt, Inc.*, 2024 WL 5057218 (S.D.N.Y. Nov. 19, 2024) (hereinafter *Spreadshirt I*), *adopted*, 2024 WL 5056647 (S.D.N.Y. Dec. 10, 2024). On December 10, 2024, she filed a fourth action, *Reveron v. RedBubble, Inc.*, No. 24-CV-09382 (S.D.N.Y.). That case was closed on January 20, 2026, after plaintiff

11

entitled to "less deference than most pro se litigants because of her extensive litigation history." *In re Lynch*, 2022 WL 16467, at *2 (2d Cir. Jan. 3, 2022) (summary order); *see also Tracy v. Freshwater*, 623 F.3d 90, 102 (2d Cir. 2010) ("[T]he degree of solicitude may be lessened where the particular *pro se* litigant is experienced in litigation and familiar with the procedural setting presented.").

### B.    Rule 12(b)(6)

If a plaintiff's complaint fails to present "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," the deficient claims may be dismissed pursuant to Fed. R. Civ. P. 12(b)(6). *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 65 (2d Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. If the plaintiff has not "nudged [her] claims across the line from conceivable to plausible, [her] complaint must be dismissed." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

When faced with a Rule 12(b)(6) motion, the trial court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). I have done so here. In addition, because of plaintiff's pro se status, I have accepted – under the same standard – the factual statements made in her opposition declarations, to the extent not inconsistent with her complaint. *See Ford v. Miller*, 2019 WL 6831640, at *6 (S.D.N.Y. Aug. 23, 2019) ("factual allegations made in a *pro se* plaintiff's opposition papers, or the attachments thereto, may be

---

dismissed her claims against all defendants other than Spreadshirt, Inc. and John Does 1-3, and then failed to seek a default judgment as to those defendants. *See* Order, *Reveron v. RedBubble, Inc.*, No. 24-CV-09382 (S.D.N.Y. Jan. 1, 2026), ECF No. 54.

considered 'as supplementing the Complaint, at least to the extent they are consistent with the allegations in the Complaint'") (quoting *George v. Pathways to Hous., Inc.*, 2012 WL 2512964, at *6 n.7 (S.D.N.Y. June 29, 2012)), *adopted,* 2019 WL 4673445 (S.D.N.Y. Sept. 25, 2019); *accord Dawkins v. Biondi Educ. Ctr.*, 164 F. Supp. 3d 518, 521 n.1 (S.D.N.Y. 2016) (collecting cases).

Such factual allegations, however, "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (internal citations omitted) (quoting *Twombly*, 550 U.S. at 555, 557). Thus, the court may not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements[.]" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

In addition to the facts alleged in the body of the plaintiff's complaint, the district court may consider any document "attached to [the complaint] as an exhibit," any "statements or documents incorporated in it by reference," *Chambers v. Time Warner, Inc*., 282 F.3d 147, 152 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co*., 62 F.3d 69, 72 (2d Cir. 1995)), and any "documents that, although not incorporated by reference, are 'integral' to the complaint." *Sierra Club v. Con-Strux, LLC*, 911 F.3d 85, 88 (2d Cir. 2018) (quoting *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011)).

In addition, on a motion to dismiss, a court "may also consider matters of which judicial notice may be taken under Fed. R. Evid. 201." *Kramer v. Time Warner Inc*., 937 F.2d 767, 773 (2d Cir. 1991). Here, the Court takes judicial notice of the fact that there is a well-known New York City neighborhood called the "Lower East Side," which is sometimes abbreviated as "LES." *See Zumiez I*, 2024 WL 5131627, at *4 (taking judicial notice of the fact that there is a "well-known

13

New York City neighborhood called the 'Lower East Side,' which is sometimes abbreviated as 'LES,'" and collecting cases discussing that neighborhood); *Reveron v. Zumiez, Inc.*, 2025 WL 2472752, at *5 (S.D.N.Y. Aug. 28, 2025) (*Zumiez II*) (same).

### C.      The Lanham Act

"The Lanham Act was intended to make 'actionable the deceptive and misleading use of marks' and 'to protect persons engaged in . . . commerce against unfair competition.'" *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 767-68 (1992) (quoting 15 U.S.C. § 1127). "Toward this end, the Act provides separate causes of action for, among other things, infringement of registered and unregistered trademarks." *Fed. Treasury Enter. Sojuzplodoimport v. SPI Spirits Ltd.*, 726 F.3d 62, 72 (2d Cir. 2013). However, the elements of a federal trademark infringement claim are the same regardless of whether the plaintiff alleges infringement of registered trademarks under § 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), or unregistered trademarks under § 43(a) of the same Act, 15 U.S.C. § 1125(a). *1-800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400, 406 (2d Cir. 2005); *Down to Earth Organics, LLC v. Efron*, 2024 WL 1376532, at *3 (S.D.N.Y. Mar. 31, 2024); *Zumiez I*, 2024 WL 5131627, at *4.

Courts in this Circuit "analyze trademark infringement claims under [a] familiar two-prong test." *Erchonia Corp. v. Bissoon*, 410 F. App'x 416, 418 (2d Cir. 2011) (citing *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072 (2d Cir. 1993)). "First, we look to see whether plaintiff's mark merits protection and second, whether defendant's use of a similar mark is likely to cause consumer confusion." *Id*. At step one, only federally registered marks are presumptively protectable. *Guthrie Healthcare Sys. v. ContextMedia, Inc.*, 826 F.3d 27, 37 (2d Cir. 2016). Unregistered marks are entitled to protection only if they are "sufficiently 'distinctive' to

14

distinguish the registrant's goods from those of others." *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 381 (2d Cir. 2005).[5]

### 1.  Protectability

In determining an unregistered mark's distinctiveness, courts classify marks into one of four categories "famously elucidated" by Judge Friendly: generic, descriptive, suggestive, and arbitrary or fanciful. *Perfect Pearl Co. v. Majestic Pearl & Stone, Inc.*, 887 F. Supp. 2d 519, 531 (S.D.N.Y. 2012) (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir. 1976)). All of plaintiff's marks are geographically descriptive and thus, unless they are federally registered, are "protectable 'only if they are shown to have acquired secondary meaning to consumers.'" *Spreadshirt I*, 2024 WL 5057218, at *4 (quoting *Einhorn v. Mergatroyd Prods.*, 426 F. Supp. 2d 189, 195 (S.D.N.Y. 2006)); *see also Thompson Med. Co. v. Pfizer Inc.*, 753 F.2d 208, 216 (2d Cir. 1985) ("If an unregistered mark is deemed descriptive, proof of secondary meaning is required for the mark to be protectible.").

If, at step one, the court finds that a particular mark is "ineligible for protection, there is no need to examine likelihood of confusion" at step two, as such inquiry would be "redundant, since a determination that a mark is ineligible for protection establishes that consumers do not associate that mark with a particular source." *Thompson Med. Co.*, 753 F.2d at 216. If the mark is protectible, the court proceeds to step two and examines the eight factors laid out in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961), to assess whether plaintiff has plausibly alleged a likelihood of consumer confusion.

---

[5] For unregistered marks, there is some overlap in the two steps, because "[t]he central consideration in assessing a[n] [unregistered] mark's protectability, its degree of distinctiveness, is also a factor in determining likelihood of confusion." *Erchonia*, 410 F. App'x at 418 (citing *Playtex Prods. v. Georgia-Pacific Corp.*, 390 F.3d 158, 161 (2d Cir. 2004)).

### 2.    Likelihood of Confusion

"[I]n addition to demonstrating that the plaintiff's mark is protected, the plaintiff must prove that the defendant's use of the allegedly infringing mark would likely cause confusion as to the origin or sponsorship of the defendant's goods with plaintiff's goods." *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 114 (2d Cir. 2009) (collecting cases). Thus, to survive a Rule 12(b)(6) motion, the plaintiff must plausibly allege facts demonstrating the likelihood of confusion. *See E.A. Sween Co., Inc. v. A & M Deli Express Inc.*, 787 F. App'x 780, 783 (2d Cir. 2019) (summary order) (affirming dismissal pursuant to Rule 12(b)(6) where plaintiff "failed to allege sufficient facts to show likelihood of confusion"). To determine whether there is a likelihood of confusion, courts in this Circuit first determine whether the defendant used the mark "in commerce," 15 U.S.C. §§ 1114(1)(a), 1125(a)(1), and then apply the eight-factor balancing test introduced in *Polaroid.* Those eight factors are:

> (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market.

*Starbucks*, 588 F.3d at 115.

### 3.    Fair Use

The fair use defense is outlined in § 33(b)(4) of the Lanham Act, which provides an affirmative defense to an infringement claim where the use of the mark by the defendant "is a use, otherwise than as a mark, . . . which is descriptive of and used fairly and in good faith only to describe the goods or services of such party, or their geographic origin[.]" 15 U.S.C. § 1115(b)(4). The fair use defense thus "permits use of protected marks in descriptive ways, but not as marks identifying the user's own product." *Naked Cowboy v. CBS*, 844 F. Supp. 2d 510, 515 (S.D.N.Y.

16

2012). "In order to make a successful fair use defense to a trademark infringement claim, the defendant must prove three elements: that the use was made (1) other than as a mark, (2) in a descriptive sense, and (3) in good faith." *Kelly-Brown v. Winfrey*, 717 F.3d 295, 305 (2d Cir. 2013); *accord EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.*, 228 F.3d 56, 64 (2d Cir. 2000). While the fair use defense "often requires consideration of facts outside of the complaint and thus is inappropriate to resolve on a motion to dismiss," it can be adjudicated pursuant to Rule 12(b)(6) "where the facts necessary to establish the defense are evident on the face of the complaint." *Kelly-Brown*, 717 F.3d at 308; *accord McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004). The fair use defense applies to trademark infringement claims for both registered and unregistered trademarks. *Zumiez I*, 2024 WL 5131627, at \*5; *Zumiez II*, 2025 WL 2472752, at \*6.

Some courts (including district courts within this Circuit) consider an element of the fair use defense – specifically, whether the defendant used the mark "other than as a mark," *Kelly-Brown*, 717 F.3d at 305 – before assessing whether that use was likely to cause confusion. *See*, *e.g.*, *Zumiez I*, 2024 WL 5131627, at \*4 ("before assessing whether the use of a mark is likely to cause confusion, a court must first assess whether a trademark 'use' has occurred in the first place"); *Kassa v. Detroit Metro Convention & Visitors Bureau*, 150 F. Supp. 3d 831, 837 (E.D. Mich. 2015) ("before a court examines [the *Polaroid*] factors, it must first determine whether a defendant is using the challenged mark in a way that identifies the source of its goods or services.") (cleaned up), *aff'd*, 672 F. App'x 575 (6th Cir. 2017). The Sixth Circuit has endorsed this approach, *see Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 610 (6th Cir. 2009) ("[T]he likelihood of confusion analysis also involves a preliminary question: whether the defendants are using the challenged mark in a way that identifies the source of their goods. If they are not, then the mark is

17

being used in a non-trademark way and trademark infringement laws, along with the eight-factor analysis, do not even apply.") (internal quotations and citation omitted), and defendants urge this Court to adopt it here. *See* Walmart Mem. at 16-18; ABG Mem. at 2.

However, the Second Circuit has rejected *Hensley*, expressly "declin[ing] to adopt the rule that Lanham Act plaintiffs must show that the defendant was using the allegedly infringing content 'as a mark' as a threshold issue in order to establish consumer confusion." *Kelly-Brown*, 717 F.3d at 308. As the Court of Appeals explained, the only "threshold requirement" that the plaintiff must establish, preparatory to demonstrating likelihood of confusion, is that the defendant used the mark "in commerce" – which is "satisfied if the mark is affixed to the goods 'in any manner.'" *Id.* at 305 (quoting 15 U.S.C. § 1127)); *see also Unicorn Crowdfunding, Inc. v. New St. Enter., Inc.*, 507 F. Supp. 3d 547, 563 (S.D.N.Y. 2020) (A plaintiff must, as a "threshold burden," "show 'use in commerce' as an element of an infringement claim."). Here, there is no dispute as to the "use in commerce" element. Accordingly, when considering each of the accused products, I do not reach the question of "trademark use" (as part of the fair use defense) until and unless I have determined that plaintiff has satisfied the "familiar two-prong test" for trademark infringement, including likelihood of confusion.

III.   **ANALYSIS**

   A.   **First Cause of Action (Registered Trademarks)**

      1.   **Protectability**

Plaintiff's LES NYC® mark is federally registered with the USPTO, which is sufficient "prima facie evidence that the mark is registered and valid (*i.e.*, protectable), that the registrant owns the mark, and that the registrant has the exclusive right to use the mark in commerce." *Guthrie Healthcare Sys.*, 826 F.3d at 37. Consequently, the key issue with respect to Walmart's

18

alleged infringement of the LES NYC® mark is whether plaintiff has sufficiently alleged likelihood of consumer confusion, which I address below.

As to LES NEW YORK®, Walmart argues that although plaintiff has registered the mark with the USPTO, she lacks standing to assert a claim under § 32(1) of the Lanham Act as to this mark because it was not registered until after the commencement of this lawsuit. *See* Walmart Mem. at 23 n.11. I agree. Statutory standing, for purposes of § 32(1), "is to be determined as of the commencement of suit, even for plaintiffs seeking forward-looking relief." *Doe v. McDonald*, 128 F.4th 379, 384 (2d Cir. 2025) (internal quotations and citation omitted); *see also L'Oreal USA, Inc. v. Trend Beauty Corp.*, 2013 WL 4400532, at *11 (S.D.N.Y. Aug. 15, 2013) ("[s]tanding must be assessed under the facts existing when the complaint is filed," and cannot be conferred retroactively) (internal quotations and citation omitted); *Grasshopper Gardens, Inc. v. PMA Mech. LLC*, 2025 WL 2711066, at *13-15 (N.D.N.Y. Sept. 23, 2025) (collecting cases and holding that plaintiff lacked statutory standing to bring a § 32(1) claim because he was not the registrant of the trademark at the time the suit was commenced), *appeal transferred*, 2025 WL 3536069 (Fed. Cir. Dec. 10, 2025); *Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*, 402 F.3d 1198, 1202 n.3 (Fed. Cir. 2005) ("[S]tanding . . . is assessed at the time of the original complaint, even if the complaint is later amended.") (collecting cases). Accordingly, plaintiff's claim for infringement of the LES NEW YORK® mark will be analyzed (in Part III(B), below) as a claim under § 43(a) of the Lanham Act for infringement of an unregistered mark.

### 2.      Likelihood of Confusion

As to plaintiff's registered LES NYC® mark, the remaining question is whether plaintiff has plausibly alleged that defendants' use of that mark "in commerce" "would likely cause confusion as to the origin or sponsorship of the defendant's goods with plaintiff's goods." *Starbucks*, 588 F.3d at 114. "Likelihood of confusion includes confusion of any kind, including

confusion as to source, sponsorship, affiliation, connection, or identification." *Guiness United Distillers & Vintners B.V. v. Anheuser-Bush, Inc.*, 2002 WL 1543817, at \*2 (S.D.N.Y. July 12, 2002); *see also Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 205 (2d Cir. 1979) ("The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement.").

As noted above, courts in this Circuit apply the eight-factor *Polaroid* test to assess likelihood of confusion. *Starbucks*, 588 F.3d at 115. However, no one factor is dispositive, and "additional factors may be considered or initial factors abandoned." *Gruner*, 991 F.2d at 1077; *see also Starbucks*, 588 F.3d at 115 ("The application of the *Polaroid* test is 'not mechanical, but rather, focuses on the ultimate question of whether, looking at the products in their totality, consumers are likely to be confused.'") (quoting *Star Indus.*, 412 F.3d at 384). Courts need not "slavishly recite" all *Polaroid* factors in their analyses, so long as they "consider sufficient factors to reach the ultimate conclusion as to whether or not there is a likelihood of confusion." *Orient Express Trading Co., Ltd. v. Federated Dep't Stores, Inc.*, 842 F.2d 650, 654 (2d Cir. 1988); *World Trade Centers Ass'n, Inc. v. Port Auth. of N.Y. & N.J.*, 2016 WL 8292208, at \*2 (S.D.N.Y. Dec. 15, 2016) ("courts have not required all factors to be addressed in order to find adequate pleading of a likelihood of confusion.") (collecting cases). Ultimately, it is plaintiff's burden to allege "a probability of confusion, not a mere possibility," affecting "numerous ordinary prudent purchasers." *Gruner*, 991 F.2d at 1077.

"Normally, the likelihood of confusion is a factual question, centering on the probable reactions of prospective purchasers of the parties' goods." *Pirone v. MacMillan, Inc.*, 894 F.2d 579, 584 (2d Cir. 1990). Thus, courts are hesitant to grant a motion to dismiss on this ground unless it is clear that the products or marks are so dissimilar that no question of fact is presented. *See,*

20

*e.g.*, *World Trade Centers Ass'n*, 2016 WL 8292208, at *2; *cf. Lopez v. Nike, Inc.*, 2021 WL 128574, at *7 (S.D.N.Y. Jan. 14, 2021) (granting motion to dismiss where Lopez's allegations of consumer confusion were overshadowed by "significant dissimilarities" between his LES NYC® mark and defendant's LES BENJAMINS mark), *adopted*, 2021 WL 2207451 (S.D.N.Y. Feb. 16, 2021).

### a.    *Walmart*

Walmart T-Shirt 1 is the only accused Walmart product displaying the text "LES NYC." Plaintiff alleges that Walmart T-Shirt 1 is "almost identical" to one of her t-shirts, SAC ¶ 115, in that it bears an "identical representation of Plaintiff's LES NYC® mark." *Id*. ¶ 114. Both products, plaintiff notes, display the mark "on the front of the t-shirt," in a similar "distressed font." *Id*. Additionally, plaintiff alleges that on July 4, 2024, she was contacted by a customer who "purchased an LES NYC® t-shirt from the website www.walmart.com believing the t-shirt offered and sold by Defendant Walmart was sponsored and/or affiliated with Plaintiff." *Id*. ¶ 113.

Walmart does not challenge the adequacy of these allegations other than to characterize them as "general." Walmart Mem. at 11. While plaintiff's allegations of consumer confusion are not particularly detailed, and do not address every *Polaroid* factor, they are sufficient at this early stage of litigation to raise a plausible inference of consumer confusion as to Walmart T-Shirt 1.

The first *Polaroid* factor – strength of the mark – weighs in plaintiff's favor. *See RiseandShine Corp. v. PepsiCo, Inc.*, 41 F.4th 112, 119 (2d Cir. 2022) (characterizing this factor as "often the most important factor"). Federal registration of a mark with the USPTO is considered *prima facie* evidence of a mark's strength. *See, e.g., Guiness United Distillers & Vintners B.V.*, 2002 WL 1543817, at *3 (registration entitles a mark to a presumption of strength); *Guishan, Inc. v. Faith Ice, Inc.*, 2010 WL 1223574, at *2 (E.D.N.Y. Mar. 22, 2010) (same). The second factor – similarity of the marks – also weighs substantially in plaintiff's favor. *See N.Y. State Elec. & Gas*

*Corp. v. U.S. Gas & Elec., Inc.*, 697 F. Supp. 2d 415, 431 (W.D.N.Y. 2010) (noting that similarity is a "key factor" of "salient importance" and collecting cases). Plaintiff is correct that her LES NYC® t-shirt and Walmart T-Shirt 1 are nearly identical in that they depict the same text ("LES NYC") in roughly the same location and size, arranged the same way, and in a similar font. Both shirts, moreover, are devoid of any other text or decoration on the front of the garment that would serve to distinguish them from one another. The degree of similarity is magnified by the third factor – proximity – as plaintiff and defendant Walmart are competitors in the apparel market. *See N.Y. State Elec. & Gas Corp*, 697 F. Supp. 2d at 431-32 (noting that similarity of the marks is of particular salience and importance "where the parties are direct competitors") (quoting *Boston Duck Tours, LP v. Super Duck Tours, LLC*, 531 F.3d 1, 26 (1st Cir. 2008)). Lastly, plaintiff has pleaded at least one instance of actual confusion, which is sufficient to satisfy the fifth *Polaroid* factor. *See N.Y. State Elec. & Gas Corp.*, 697 F. Supp. 2d at 437-38 (finding that one "isolated instance of confusion" was sufficient at the pleading stage). At the motion to dismiss stage, and in the absence of any meaningful challenge by Walmart, I conclude that plaintiff has plausibly alleged a likelihood of consumer confusion with respect to Walmart T-Shirt 1.

Walmart T-Shirts 2-5, however, do not use the text "LES NYC." They do not even use the text "LES." Instead, they use the phrase "Lower East Side" in a variety of configurations, colors, and fonts. Not surprisingly, therefore, plaintiff does not allege that Walmart T-Shirts 2-5 are visually similar to any specific products bearing the LES NYC® mark. Nor does she plead that any customers were actually confused by Walmart T-Shirts 2-5. Instead, she alleges – in highly conclusory terms, and without specifying any particular t-shirt – that the "design elements of Defendant Walmart's clothing products" are "evocative of the design elements of Plaintiff's clothing products" bearing her Marks. SAC ¶ 116; *see also id*. ¶ 117 ("Some of the other t-shirts

sold by Defendant Walmart . . . are also like various t-shirt designs that Plaintiff sells and offers under her collection of LES NYC® and other similar marks.").

As to Walmart T-Shirts 2-5, therefore, I conclude that plaintiff has not plausibly alleged a likelihood of confusion with her registered mark LES NYC®. While the first and third *Polaroid* factors (strength of the mark and proximity) again weigh generally in plaintiff's favor, she does not make any specific factual allegations as to similarity of the marks, actual consumer confusion, or any of the remaining *Polaroid* factors. *See Ahmed v. GEO USA LLC*, 2015 WL 1408895, at *3 (S.D.N.Y. Mar. 27, 2015) (plaintiff failed to plead likelihood of confusion where he alleged only that "Defendant's use of the mark is 'confusingly similar' to Plaintiff's mark and that Defendant is using the mark 'to divert customers and further mislead and deceive the customers of the Plaintiff'"); *Volvo N. Am. Corp. v. Men's Int'l Pro. Tennis Council*, 687 F. Supp. 800, 813 (S.D.N.Y. 1988) ("conclusory allegations that confusion is likely to occur and three specific occasions of actual confusion . . . are insufficient to make out a claim . . . under the Lanham Act"); *Pub. Free Will Corp. v. Verizon Commc'ns Inc.*, 2017 WL 1047330, at *4 (E.D.N.Y. Mar. 17, 2017) ("legal conclusions that track the text of 15 U.S.C. § 1125 and the *Polaroid* factors [] are insufficient to give rise to a plausible claim.").

In the absence of adequate allegations as to likelihood of confusion, plaintiff has failed to state a claim under § 32(1) of the Lanham Act for trademark infringement of her federally registered LES NYC® mark with respect to Walmart T-Shirts 2-5. Consequently, there is no need to consider whether Walmart is entitled to the fair use defense with respect to T-Shirts 2-5. In Part III(A)(3) below, I consider whether Walmart is entitled to the fair use defense with respect to Walmart T-Shirt 1.

b.    *ABG*

As to the Forever 21 Pullover, plaintiff alleges that there has been actual consumer confusion: "On June 27, 2024, I received a text message from a long-standing customer Janisse that stated . . . 'Hey mama . . . so happy for you. congratulations on getting your les nyc brand in Forever 21 stores . . . that's huge. I love it. I ordered one from the forever21 website to show support and it just came in today." SAC ¶ 96. Plaintiff additionally alleges that "[t]he accused pullover sweater . . . [is] nearly identical" to a pullover hoodie she sells bearing the LOWER EAST SIDE NEW YORK CITY™ mark, *id*. ¶¶ 97-98, 101, which "has already caused confusion and is likely to continue to cause confusion as to the source of [the] clothing products." *Id*. ¶¶ 99-101.

The garments – depicted side-by-side in plaintiff's complaint, *see* SAC ¶ 97 – are indeed very similar. Both display three stacked lines of white, capitalized text across the chest: "LOWER EAST SIDE," in smaller font, appears on the first line; "NEW YORK CITY," in larger font, appears on the second line; and either "NYC" (on plaintiff's hoodie) or "NY" (on the Forever 21 Pullover), in the largest font, on the third line. *Id*. The only meaningful distinctions are that: (1) the Forever 21 Pullover contains a fourth line of text, stating "ATHLETICS UNITED CLUB," in small, white capital letters; whereas (2) plaintiff's hoodie appears to display a second version of the same three lines of text ("LOWER EAST SIDE/NEW YORK CITY/NYC") in much smaller font – and in black text outlined in white – near the left shoulder, arranged diagonally. *Id*.; *see supra* n.2. Despite these small differences, the two garments are, at first glance, visually very similar.

But similarity to a garment using plaintiff's LOWER EAST SIDE NEW YORK CITY™ mark is not the dispositive inquiry under § 32(1) of the Lanham Act. The relevant inquiry, for purposes of plaintiff's first cause of action, is whether the Forever 21 Pullover is likely to cause confusion with plaintiff's registered LES NYC® mark. Thus, ABG emphasizes that the words

24

"LES NYC" appear nowhere on the accused garment, and argues that plaintiff cannot maintain a claim under § 32(1) for the Forever 21 Pullover because plaintiff does not own *any* federal registration for *any* mark containing the phrase "LOWER EAST SIDE." ABG Mem. at 2, 5, 8. In her opposition papers, plaintiff fails to rebut this point. *See* Pl. ABG Decl. ¶ 12 (arguing only that "[c]onsumers may believe the product is affiliated with, licensed by, or endorsed by the owner of the LOWER EAST SIDE NEW YORK CITY mark").

ABG's argument overstates applicable law. *See*, *e.g.*, *Lopez v. Adidas Am., Inc.*, 2020 WL 2539116, at *5 (S.D.N.Y. May 19, 2020) (noting that "similarity between two marks" is only one of the *Polaroid* factors, and thus that the defendant need not have used "the exact same, *verbatim*, mark that the plaintiff had registered" to be liable under § 32(1)). However, the burden still remains with plaintiff to show that the Forever 21 Pullover creates a likelihood of confusion with her LES NYC® mark, and neither the factual allegations contained in the SAC nor the images that plaintiff supplies support such an inference. Indeed, plaintiff relies primarily on conclusory allegations that the Forever 21 Pullover somehow infringes *all* of the Marks at issue in this action, *see* SAC ¶¶ 97, 99; Pl. ABG Decl. ¶ 9, which is insufficient as a matter of law to survive a motion to dismiss. *See*, *e.g., Pub. Free Will Corp.*, 2017 WL 1047330, at *4 ("legal conclusions that track the text of 15 U.S.C. § 1125 and the *Polaroid* factors [] are insufficient to give rise to a plausible claim."). Consequently, plaintiff's first cause of action should be dismissed as against ABG.

### 3. Fair Use

I next consider whether the first cause of action should be dismissed as to Walmart T-Shirt 1 based upon the fair use defense. "Fair use is a defense to liability under the Lanham Act even if a defendant's conduct would otherwise constitute infringement of another's trademark." *Cosmetically Sealed Indus., Inc. v. Chesebrough-Pond's USA Co.*, 125 F.3d 28, 30 (2d Cir. 1997). The defense "protects the right of society at large to use words or images in their primary

25

descriptive sense, as against the claims of a trademark owner to exclusivity." *Car-Freshner Corp. v. S.C. Johnson & Son, Inc.*, 70 F.3d 267, 269 (2d Cir. 1995); *see also Kelly-Brown*, 717 F.3d at 308 ("[T]he mere fact that someone owns a mark that contains a particular word or phrase does not grant the holder the exclusive right to use that word or phrase commercially."); *EMI Catalogue P'Ship*, 228 F.3d at 64 ("[T]he owner's rights in a mark extend only to its significance as an identifying source, not to the original descriptive meanings of a mark[.]"). Consequently, where the complaint shows that the defendant's use of the mark is "purely descriptive," it may qualify as a permissible "fair use" and require dismissal of the plaintiff's otherwise well-pleaded infringement claim. *See*, *e.g.*, *Zumiez I*, 2024 WL 5131627, at *8 & n.6 (New Balance and ALD's use of the phrases "Lower East Side," "New York City," "LES," and "NYC" was fair use where they were descriptive of the location of a specific basketball gymnasium); *Kassa*, 150 F. Supp. 3d at 838 (use of the phrase "Welcome to the D" as a descriptive reference to the City of Detroit was fair use).

As noted above, the elements of the fair use defense are that the use was made (1) other than as a mark, (2) in a descriptive sense, and (3) in good faith. *See* 15 U.S.C. § 1115(b)(4); *EMI Catalogue P'ship*, 228 F.3d at 64. Since fair use is an affirmative defense, it may only be adjudicated at the pleading stage of litigation "where the facts necessary to establish the defense are evident on the face of the complaint." *Kelly-Brown*, 717 F.3d at 308. In rebutting Walmart's fair use defense, plaintiff is "held only to the usual burden of a motion to dismiss, which is to say [she] must plead sufficient facts to plausibly suggest that [she is] entitled to relief." *Id*.

As to the first and second prongs, in determining whether the defendant used plaintiff's mark "as a mark" (as opposed to "in a descriptive sense") the first question is whether the defendant used the "term as a symbol to attract public attention." *Kelly-Brown*, 717 F.3d at 306 (quoting *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 400 (2d Cir. 2009)). There is no single set of factors that

26

courts must consider in determining whether a particular use is a trademark use or a descriptive use. *See Kelly-Brown*, 717 F.3d at 311. However, courts frequently consider indicia that the mark is being used as a symbol, such as the size, placement, or degree of stylization, *see, e.g.*, *Zumiez I*, 2024 WL 5131627, at *5, and whether the defendant's own trademark is prominently displayed on the goods to indicate their origin. *Kelly-Brown*, 717 F.3d at 310. Ultimately, the "touchstone in such an analysis is whether the use of the allegedly infringed-upon trademark is done 'to identify and distinguish [defendant's] goods from those of others.'" *Zumiez I*, 2024 WL 5131627, at *5 (quoting *Eli Lilly & Co. v. Revlon, Inc.*, 577 F. Supp. 477, 486 (S.D.N.Y. 1983)); *see also Dessert Beauty, Inc. v. Fox*, 568 F. Supp. 2d 416, 424 (S.D.N.Y. 2008) ("A trademark use occurs when a mark indicates the source or origin of consumer products.").

Walmart argues principally that its use of the letters "LES NYC" on Walmart T-Shirt 1 is a "mere geographic reference to the Lower East Side neighborhood in New York City," which is a "classic example of non-actionable fair use." Walmart Mem. at 16. Plaintiff disagrees, alleging that T-Shirt 1 uses "LES NYC" "as a symbol to attract public attention." SAC ¶¶ 120, 122. At this early stage of the case, plaintiff's view is plausible. Walmart T-Shirt 1 depicts the words "LES NYC" on the chest of an otherwise empty t-shirt. *See* SAC at 42 & Ex. R. The phrase is stylized in a distressed typeface and in a relatively large font (easily readable by, for example, a person passing the wearer on the street), thus looking much like a logo or symbol. Moreover, T-Shirt 1 does not bear any other text or decoration, much less any of Walmart's own marks or logos to denote its origin. Nor (at least insofar as the SAC reveals) did Walmart use a hangtag or neck label that would clarify the source of the product for consumers. *Cf. Cosmetically Sealed*, 125 F.3d at 30 (affirming dismissal of infringement claim on fair use grounds where, among other things, "[t]he non-trademark use of the challenged phrase and the defendants' good faith are both

evidenced by the fact that the source of the defendants' product is clearly identified by the prominent display of the defendants' own trademarks"). Finally, nothing on the shirt supports Walmart's claim that "LES NYC" is a "mere geographic reference." *Cf. Zumiez I*, 2024 WL 5131627, at *7-8 (dismissing Reveron's infringement claims against New Balance on fair use grounds where, among other things, the accused garments included images of basketballs, and the word "Masaryk," thus clearly referencing a basketball gymnasium located on the Lower East Side of New York). I therefore cannot conclude, as a matter of law, that consumers would perceive the phrase "LES NYC" on Walmart T-Shirt 1 as merely geographically descriptive, rather than as a source-identifying mark.

It is true, as Walmart points out, *see* Walmart Mem. at 12, that the word "BRONX" (followed by the phrase "Est. 1998") appears in the upper left-hand corner of plaintiff's Exhibit R, which is a printout of Walmart's e-commerce page for Walmart T-Shirt 1 as it appeared on July 18, 2024. *See* SAC Ex. R. But there is no reference to any other geographical location on the shirt itself. Nor does the webpage otherwise suggest that "LES NYC" is a geographical reference. Thus, the single occurrence of the word "BRONX" in the corner of the webpage advertising Walmart T-Shirt 1 is insufficient to overcome plaintiff's otherwise well-pleaded allegations that the use of "LES NYC" on that garment could be construed by consumers as a mark rather than as a description.

Finally, as to the third prong of the fair use defense, plaintiff alleges that Walmart's use was not in "good faith" because Walmart was aware of plaintiff's mark yet chose to sell and promote the allegedly infringing product on its website. SAC ¶¶ 123-129. Specifically, plaintiff alleges that Walmart knew about her registered trademark because, in 2017, her predecessor brought a lawsuit against Walmart for infringing the same LES NYC® mark (albeit in regard to a

different clothing product). *Id*. ¶ 124. In addition, plaintiff alleges that Walmart "was aware of a Confidential Settlement Agreement" that arose out of that 2017 lawsuit. *Id*. ¶ 128. In opposition, Walmart argues that its alleged knowledge of the prior litigation and settlement "does not equate to bad-faith in *this* case as to *these* products." Walmart Mem. at 31. At best, however, this argument raises a dispute of fact which is not appropriate for resolution pursuant to Rule 12(b)(6).

Accordingly, as to plaintiff's first cause of action, ABG's motion to dismiss should be granted, and Walmart's motion to dismiss should be granted as to Walmart T-Shirts 2-5, but denied as to Walmart T-Shirt 1.

### B.    Second Cause of Action (Unregistered Trademarks)

None of plaintiff's remaining marks is federally registered.[6] As discussed above, an unregistered mark is protectable only if it is sufficiently distinctive. *See Perfect Pearl Co.*, 887 F. Supp. 2d at 531. Here, plaintiff's unregistered marks (LES NEW YORK®, LOWER EAST SIDE™, LOWER EAST SIDE NYC™, and LOWER EAST SIDE NEW YORK CITY™) are all geographically descriptive of the Lower East Side of Manhattan, and consequently are protectable "only if they are shown to have acquired secondary meaning to consumers." *Einhorn*, 426 F. Supp. 2d at 195; *Forschner Grp., Inc. v. Arrow Trading Co. Inc.*, 30 F.3d 348, 353 (2d Cir. 1994) (collecting cases) ("a phrase or term that is descriptive of the geographic origin of a product will not receive trademark protection absent proof of secondary meaning.")

The party asserting trademark rights in a geographically descriptive mark "bears the burden of alleging that the mark had acquired secondary meaning 'before its competitor commenced use

---

[6] Plaintiff concedes that she does not have standing to bring a § 32(1) claim for her unregistered marks. Pl. Walmart Decl. ¶ 25 ("conced[ing] that Section 32(1) claims are limited to trademarks that have federal registrations" and affirming that her "claims relating to common law trademarks and New York State registrations are brought under Section 43(a) of the Lanham Act" only); Pl. ABG Decl. ¶ 28 (same).

of the mark.'" *Reveron v. Spreadshirt, Inc.*, 2025 WL 1852393, at *5 (S.D.N.Y. May 20, 2025) (hereinafter *Spreadshirt II*) (quoting *PaperCutter, Inc. v. Fay's Drug Co., Inc.*, 900 F.2d 558, 564 (2d Cir. 1990)), *adopted in part, rejected in part*, 2025 WL 1680209 (S.D.N.Y. June 16, 2025); *Spreadshirt I*, 2024 WL 5057218, at *4. A descriptive mark acquires secondary meaning "*only* in cases where an ordinary buyer associates the mark in question with a single source[.]" *Erchonia*, 410 F. App'x at 418; *see also Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1040 (2d Cir. 1992) (a term is considered to have "acquired a secondary meaning in its particular market [if] the consuming public primarily associates the term with a particular source"); *Time, Inc. v. Petersen Pub. Co. L.L.C.*, 173 F.3d 113, 117 (2d Cir. 1999) ("Secondary meaning attaches when the name and the business have become synonymous in the mind of the public, submerging the primary meaning of the term in favor of its meaning as a word identifying that business.") (internal quotations and citation omitted); *Morgans Grp. LLC v. John Doe Co.*, 2012 WL 1098276, at *5 (S.D.N.Y. Mar. 31, 2012) ("A plaintiff must show that a substantial segment of the relevant consumer group makes the requisite association between the product and the producer.") (internal quotations and citation omitted).

Courts in this Circuit weigh six factors in determining whether a mark has acquired secondary meaning: "(1) advertising expenditures; (2) consumer studies linking the mark to a source; (3) unsolicited media coverage of the product; (4) sales success; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the mark's use." *Erchonia*, 410 F. App'x at 418; *accord Spreadshirt I*, 2024 WL 5057218, at *5; *Thompson Med. Co.*, 753 F.2d at 217 (collecting cases). While plaintiff need not establish every factor – and "[n]o single factor is dispositive," *Erchonia*, 410 F. App'x at 418 – her pleadings must, at a minimum, "include . . . some of the facts necessary to plausibly allege' that [each] mark has acquired secondary meaning." *Spreadshirt I*,

2024 WL 5057218, at \*5; *see also id.* at \*4 ("If a plaintiff has not alleged facts that support an inference that the mark has acquired secondary meaning, the plaintiff's claims for trademark infringement and unfair competition cannot survive a motion to dismiss.").

Here, the only factors that weigh in favor of a finding of secondary meaning and are supported by plaintiff's factual allegations are sales growth and length of use. This is not enough. Thus, as shown below, plaintiff has failed to raise a plausible inference that the LES NEW YORK®, LOWER EAST SIDE™, LOWER EAST SIDE NYC™, and LOWER EAST SIDE NEW YORK CITY™ marks have acquired secondary meaning.

### 1.    Advertising Expenditures

Advertising expenditures may support an inference that a mark has acquired secondary meaning. However, "naked advertising statistics" alone are insufficient. *See Hello I Am Elliot, Inc. v. Sine*, 2020 WL 3619505, at \*8 (S.D.N.Y. July 2, 2020) (finding "naked advertising statistics" alone were insufficient to create an inference of secondary meaning); *Exquisite Form Indus., Inc. v. Exquisite Fabrics of London*, 378 F. Supp. 403, 411 (S.D.N.Y. 1974) (finding "[n]aked advertising statistics . . . insufficient to establish secondary meaning" without information as to the "nature and quality of the advertising, or the likelihood of its inducing strong consumer identification of the mark with the product"); *Jewish Sephardic Yellow Pages, Ltd. v. DAG Media, Inc.*, 478 F. Supp. 2d 340, 372 (E.D.N.Y. 2007) (same). Moreover, plaintiff must link the alleged advertising expenses to the specific marks in dispute. *See Erchonia*, 410 F. App'x at 418 (finding this factor favored defendant where plaintiff provided only "non-itemized sales and advertising figures" without linking them to the product in dispute); *Jewish Sephardic Yellow Pages*, 478 F. Supp. 2d at 371 (finding advertising statistics insufficient to establish secondary meaning where plaintiff "provides no information concerning the proportion of expenditures dedicated to promoting" the trademark at issue).

31

Here, plaintiff defines the relevant target audience, broadly, as "consumers of clothing products." SAC ¶¶ 12-14. She alleges that between approximately 2013 and 2022, her "predecessor [] spent over $2 million in advertising the LES NYC®, LOWER EAST SIDE™, LES™ and LOYALTY EQUALS STRENGTH™ marks to consumers of clothing goods." *Id*. ¶¶ 69, 78. On information and belief, she states that her predecessor "took out full page advertisements multiple times per year, in various nationally published magazines" and "invested in paid advertisements for clothing items bearing the LES NYC®, LOWER EAST SIDE™, LOYALTY EQUALS STRENGTH™, and LES™ marks on social media platforms[.]" *Id*. ¶ 55; *see also id*. ¶¶ 70-71 (describing some of the advertisements that plaintiff or Lopez ran "over the years").

These allegations – taken as true for purposes of defendants' motions to dismiss – are too broad and diffuse to support an inference that the unregistered marks at issue in this action have acquired secondary meaning. First, with respect to the LOWER EAST SIDE™ mark, which is the only unregistered Mark as to which plaintiff alleges any actual advertising expenditures,[7] she fails to allege how much of her predecessor's total $2 million advertising budget (over ten years) was spent on this mark specifically. *See Hello I Am Elliot*, 2020 WL 3619505, at *8 (plaintiff failed to raise an inference of secondary meaning where it alleged advertising expenditures of $658,000 between 2017 and 2019, but failed to allege that those advertisements featured the specific mark in dispute); *Erchonia*, 410 F. App'x at 418 ("non-itemized sales and advertising figures are insufficient"). Likewise, plaintiff fails to allege when or for how long the LOWER EAST SIDE™ mark was the subject of any advertising, who the target audience was of that advertising, and the degree to which it reached its audience. Thus, plaintiff's "naked advertising statistic," without

---

[7] Plaintiff alleges that her predecessor spent over $2 million advertising four marks, *see* SAC ¶ 69, including two that are not at issue in this action (LES™ and LOYALTY EQUALS STRENGTH™) and one that is at issue in this action but is registered (LES NYC®).

more, is insufficient to raise a plausible inference that the LOWER EAST SIDE™ mark (or, for that matter, the other unregistered marks that she accuses Walmart and ABG of infringing) has acquired secondary meaning.

Second, as to plaintiff's LOWER EAST SIDE NYC™ and LOWER EAST SIDE NEW YORK CITY™ marks, she alleges that she "[has] run and promoted" advertisements relating to these marks, *see* SAC ¶ 70, but does not provide even a rough estimate of the associated expenditures.[8] Such a conclusory allegation is insufficient to raise a plausible inference of secondary meaning. *See, e.g.*, *Wonderful Co. LLC v. Nut Cravings Inc.*, 2022 WL 4585344, at \*3 (S.D.N.Y. Sept. 29, 2022) (plaintiffs' general allegation that they spent substantial money on advertising was insufficient to support a finding of secondary meaning); *Johns v. Winners Circle Ent., Inc.*, 2025 WL 296541, at \*4 (E.D.N.Y. Jan. 24, 2025) (plaintiff's allegation that he "invested 'substantial[ly]' in advertising, which contributed to consumer recognition . . . [was] insufficient to plausibly plead marketplace distinctiveness") (first alteration in original); *Bubble Genius LLC v. Smith*, 239 F. Supp. 3d 586, 598 (E.D.N.Y. 2017) ("[P]laintiff's allegation about its substantial investment in 'promoting, advertising and soliciting sales' is nothing more than a conclusory statement devoid of factual content that does not pass muster under *Iqbal*.").

Accordingly, plaintiff's allegations concerning the advertising that she and Lopez undertook in support of the four unregistered marks at issue in this action – LES NEW YORK®, LOWER EAST SIDE™, LOWER EAST SIDE NYC™, and LOWER EAST SIDE NEW YORK CITY™ – do not support the inference that they have acquired secondary meaning. *See Spreadshirt I*, 2024 WL 5057218, at \*5; *Spreadshirt II*, 2025 WL 1852393, at \*7.

---

[8] Plaintiff makes no allegations of advertising expenditures with respect to the LES NEW YORK® mark.

### 2.      Consumer Surveys

Plaintiff does not allege that any consumer surveys link the LES NEW YORK®, LOWER EAST SIDE™, LOWER EAST SIDE NYC™, or LOWER EAST SIDE NEW YORK CITY™ marks to her or to the LES Clothing Co. brand. Accordingly, this factor also does not support an inference of secondary meaning.

### 3.      Unsolicited Media Coverage

A finding of secondary meaning may also be supported by allegations that "the enthusiasm and loyalty of [plaintiff's customers] have been the subject of extensive, unsolicited media coverage." *Harlequin Enters. Ltd. v. Gulf & Western Corp*., 644 F.2d 946, 950 (2d Cir. 1981). Here, plaintiff alleges that beginning in 2011, her predecessor's efforts to *enforce* his trademarks, including the LOWER EAST SIDE™ mark, "garnered . . . widespread unsolicited media coverage." SAC ¶ 56. Plaintiff states that these articles "not only covered [her] predecessor's litigation pursuits but [] also provided information and news regarding [her] predecessors [*sic*] clothing products under the LES NYC®, LES ™, and LOWER EAST SIDE™ marks, his clothing website, his store location, [and] his showroom location[.]" *Id.* In addition, plaintiff alleges that products bearing the LES NEW YORK®, LOWER EAST SIDE™, and LOWER EAST SIDE NEW YORK CITY™ marks have "been endorsed and purchased by celebrities, actors, and musicians," *id*. ¶ 76, and have been worn "in movies and on television shows." *Id*. ¶ 77. Plaintiff does not specifically allege any unsolicited media coverage with respect to the LOWER EAST SIDE NYC™ mark. She attaches (as Exhibit D to the SAC) a number of these unsolicited articles,

published by news outlets ranging in scope from Vanity Fair, a national publication, to Bedford + Bowery, which is hyper-local in focus. *See* SAC Ex. D at ECF pp. 25-42.[9]

Walmart is correct that these articles, for the most part, focus "on Mr. Lopez's litigation history rather than Plaintiff's (or her predecessor's) products or brands." Walmart Mem. at 27.[10] Two other articles, both published in June 2014, report that Lopez closed his storefront after being priced out of the Lower East Side real estate market.[11] While some of the articles provide the addresses for Lopez's website and (former) store, these "passing reference[s]" are "hardly significant" in and of themselves. *See Jewish Sephardic Yellow Pages*, 478 F. Supp. 2d at 374; *see also Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.*, 830 F.2d 1217, 1224 (2d Cir. 1987) ("Not much significance may be ascribed to such citations because it is not clear what they indicate about the relevant group of consumers."). I note as well that most of the annexed articles were published more than a decade ago – some in response to discrete events such as the closing of Lopez's

---

[9] Bedford + Bowery is an online publication covering "the East Village, Lower East Side, Williamsburg, Greenpoint, Bushwick, and beyond." *See* https://perma.cc/8AGT-XUVB.

[10] *See, e.g.*, *NYC Designer to Puma: You Jacked My Logo . . . Now Pay Up!*, TMZ (November 15, 2015) (Ex. D at ECF pp. 37-38), available at https://perma.cc/YB75-BE68 (describing, in four short paragraphs, Lopez's lawsuit against Puma for its use of LES NYC®); *NYC Man Sues Macy's, Forever 21 Over 'Lower East Side' Designs: Reports*, NBC 4 New York (July 28, 2016) (Ex. D at ECF pp. 39-41), available at https://perma.cc/LJM7-AXGV (also describing Lopez's litigation efforts to enforce LES NYC®); Tim Lince, *Aggressive Trademark Litigant Decries 'Trademark Troll' label; Warns Major Brands Not Ignore Cease-and-Desists*, WTR (July 26, 2016) (Ex. D at ECF p. 42) (one paragraph article describing Lopez as an "aggressive enforcer").

[11] *See* Lisha Arino, *Designer Who Trademarked 'Lower East Side' Forced Out by Rising Rent*, dnainfo.com (June 9, 2014) (Ex. D at ECF pp. 25-27), available at https://perma.cc/7FM5-MAEP (an editorial column on business openings and closings in New York City); Kia Makarechi, *Man Who Trademarked 'Lower East Side' Priced Out of Neighborhood*, Vanity Fair (June 12, 2014) (Ex. D at ECF pp. 28-32), available at https://perma.cc/H4RZ-NYDA (similar editorial that borrows from the dnainfo.com piece and also mentions Lopez's lawsuits against companies for using the words "LOWER EAST SIDE" on their apparel).

35

storefront – and thus say little about consumers' "enthusiasm and loyalty," *Harlequin Enters. Ltd.*, 644 F.2d at 950, for any of the Marks today.

Significantly, none of the annexed articles discuss or display the unregistered marks that are at issue in plaintiff's second cause of action: LES NEW YORK®, LOWER EAST SIDE™, LOWER EAST SIDE NYC™, and LOWER EAST SIDE NEW YORK CITY™. *See Kelly-Brown*, 95 F. Supp. 3d at 359 ("Plaintiffs fail to present sufficient evidence of unsolicited media coverage discussing the [trademarked] phrase in connection with their business."); *MidCap Bus. Credit, LLC v. MidCap Fin. Tr.*, 2022 WL 684756, at *11 (S.D.N.Y. Mar. 8, 2022) (news article describing plaintiff's business in general was insufficient to plausibly allege that its descriptive mark MIDCAP had acquired secondary meaning), *aff'd in relevant part, vacated in part, remanded*, 2022 WL 17175400 (2d Cir. Nov. 23, 2022); *Heptagon Creations, Ltd. v. Core Grp. Mktg. LLC*, 2011 WL 6600267, at *8 (S.D.N.Y. Dec. 22, 2011) (plaintiff's allegation that its furniture line "has been purchased by celebrities, featured in various magazines, and commissioned for use in the decoration of public and private spaces" was insufficient to allege that the individual products in dispute had acquired secondary meaning), *aff'd*, 507 F. App'x 74 (2d Cir. 2013).

Accordingly, plaintiff's allegations with respect to unsolicited media attention, like her allegations regarding advertising expenditures, do not support an inference of secondary meaning.

### 4.    Sales Success

"Sales success is another form of circumstantial evidence that may indicate a substantial segment of consumers identifies a trade name with its source." *Morgans Grp. LLC*, 2012 WL 1098276, at *7. Here, plaintiff alleges that she and her predecessor "have collectively generated over $25 million in sales of clothing products" bearing the five Marks at issue here, as well as LES™, "over an extended period of time." SAC ¶ 69. As to the marks she acquired by assignment from Lopez in 2022, she alleges that "since at least 2016, [her] predecessor was generating several

36

million in annual sales of clothing products bearing the LES NYC®, LOWER EAST SIDE™, and LES™ marks through retail sales." *Id.* ¶ 54. Then, "[w]ithin the first six month of [] acquiring the LES NYC®, LOWER EAST SIDE™ and LES™ marks" in 2022, plaintiff "generated $270,000.00 in sales of clothing products" at her Manhattan retail store alone, "not includ[ing] wholesale orders or online website orders." *Id.* ¶ 68. In 2023, plaintiff's sales "increased to $620,000.00" just from her Manhattan sales. *Id*. Plaintiff alleges that she is now also "generating additional sales" via her website and was "projecting to be generating several million annually by 2025" based on "expanded . . . wholesale orders and licensing of the marks." *Id*. In total, she alleges that she has "generated over a million dollars in sales since 2018 under [her] additional marks that were not assigned by [her] predecessor." *Id*. ¶ 69.

These allegations weigh in plaintiff's favor. *See, e.g.*, *GeigTech E. Bay LLC v. Lutron Elecs. Co.*, 352 F. Supp. 3d 265, 284 (S.D.N.Y. 2018) (on a motion to dismiss, finding plaintiff's allegations of "growth in sales over the relevant period [sufficient] to plead the 'Sales Success' prong of the secondary meaning analysis"), *abrogated on other grounds by Cardinal Motors, Inc. v. H&H Sports Prot. USA Inc.*, 128 F.4th 112 (2d Cir. 2025); C*onnecticut Cmty. Bank v. The Bank of Greenwich*, 578 F. Supp. 2d 405, 414 (D. Conn. 2008) (finding steady sales growth weighed in favor of secondary meaning). In this case, however, plaintiff's sales growth allegations support only a weak inference of secondary meaning. Not only are the sales figures themselves fairly modest; they do not speak directly to whether the purchasing public associates plaintiffs' products with the marks at issue in this action. *See Braun Inc. v. Dynamics Corp. of Am.*, 975 F.2d 815, 826 (Fed. Cir. 1992) (noting that strong market demand for a product usually indicates product desirability, not secondary meaning); *Spreadshirt II*, 2025 WL 1852393, at *8 (finding sales of $1.2 million over five years insufficient to support secondary meaning where plaintiff did not

37

"make anything other than conclusory allegations that the sales involved efforts to associate the mark with her company as the seller"). In addition, plaintiff again fails to tie the sales to the specific marks in dispute. *See Erchonia*, 410 F. App'x at 418 ("non-itemized sales and advertising figures are insufficient"). Moreover, for the reasons discussed above with respect to advertising expenditures, "sales success alone cannot establish secondary meaning." *Hello I Am Elliot*, 2020 WL 3619505, at *9 (quoting *GeigTech E. Bay LLC*, 352 F. Supp. 3d at 284). I therefore conclude that this factor weighs only modestly in favor of plaintiff.

### 5. Other Infringement Attempts

While some courts consider "proof of intentional copying" as a factor when considering infringement claims concerning unregistered marks, it usually will not "by itself . . . trigger any presumption of secondary meaning under Second Circuit precedent." *Kaufman & Fisher Wish Ltd. v. F.A.O. Schwarz*, 184 F. Supp. 2d 311, 319 & n.4 (S.D.N.Y. 2001) (collecting cases). This is particularly true where the mark in question is descriptive. *See Therapy Prods., Inc. v. Bissoon*, 623 F. Supp. 2d 485, 495 (S.D.N.Y. 2009) ("there is little probative value to another party's use of a descriptive term on its competing product"), *aff'd in relevant part, remanded in part sub nom. Erchonia Corp. v. Bissoon*, 410 F. App'x 416 (2d Cir. 2011). Indeed, it is often "tautological to conclude that copying alone demonstrates 'secondary meaning' . . . where that copying is only prohibited . . . if the mark has 'secondary meaning.'" *ITC Ltd. v. Punchgini, Inc.*, 373 F. Supp. 2d 275, 291 (S.D.N.Y. 2005), *aff'd*, 482 F.3d 135 (2d Cir. 2007). Thus, when considering a descriptive mark, courts often point out that widespread use of its components tends to indicate that the mark "is not particularly distinctive in the marketplace." *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 744 (2d Cir. 1998) (concluding that STREETWISE was not distinctive "in the marketplace" for maps, where there was "extensive use of the words 'street' and 'wise' in names

38

registered by manufacturers of other products," which "weaken[ed] the strength of Streetwise's mark").

Here, plaintiff alleges, in a single sentence, that "[a]side from the instant case, there have been many attempts by other third parties to plagiarize Plaintiff's marks that are the subject of this action including but not limited to uses by other third parties of the marks LOWER BEAST SIDE, LOWER EAST SQUAD and LOWER EAST NY." SAC ¶ 75. These conclusory allegations – regarding marks that were used at unknown times in relation to unknown products or services – say little if anything about whether plaintiff's LES NEW YORK®, LOWER EAST SIDE™, LOWER EAST SIDE NYC™, and LOWER EAST SIDE NEW YORK CITY™ marks, as used on clothing, have acquired secondary meaning. I note that two of the allegedly plagiarized marks appear to be humorous plays on the name of the Lower East Side neighborhood. It would thus be "tautological to conclude" that the mere fact of these uses demonstrates that plaintiff's marks have acquired secondary meaning, since such copying "is only prohibited . . . if the mark[s] [have acquired] 'secondary meaning.'" *ITC Ltd.*, 373 F. Supp. 2d at 291. Accordingly, I conclude that this factor is, at best, neutral.

### 6.    Length and Exclusivity

Finally, as to length and exclusivity of use, plaintiff alleges that her predecessor has used the LOWER EAST SIDE™ mark since 1997. SAC ¶ 50. She further alleges that all of the Marks in dispute have been "in continuous use in commerce in connection with clothing for over twenty-seven (27) years by Plaintiff and/or her predecessor collectively." *Id*. ¶ 69. This allegation is inconsistent, in part, with plaintiff's trademark registrations. While her USPTO registration for LES NEW YORK® and her pending USPTO application for LOWER EAST SIDE NEW YORK CITY™ list December 1999 as the date of first use, *see* USPTO Reg. 7,551,816; USPTO App.

39

98/445,032 at 2, her state registration for LOWER EAST SIDE NYC™ lists June 10, 2018 as the date of first use. *See* NY Reg. R34382.

More importantly, plaintiff has not alleged "exclusivity" of use – of any of the Marks – during any portion of the 27 years she claims. Courts in our Circuit routinely find "that whatever the length of use by one party, use of part or all of a mark by third parties weakens the mark's strength and is a factor weighing against a finding of exclusivity." *Rockland Exposition, Inc. v. All. of Auto. Serv. Providers of New Jersey*, 894 F. Supp. 2d 288, 323 (S.D.N.Y. 2012) (collecting cases), *as amended* (Sept. 19, 2012); *see also Streetwise Maps*, 159 F.3d at 744 (widespread third-party use of the words making up a descriptive mark tends to indicate that the mark "is not particularly distinctive in the marketplace"); *Spreadshirt I*, 2024 WL 5057218, at *5 ("longstanding use alone," particularly in the absence of allegations of exclusivity, "cannot demonstrate secondary meaning") (citation omitted).

Here, it is clear from the face of the SAC – and from plaintiff's allegations in her previous lawsuits, of which this Court can take judicial notice – that "LES" and "Lower East Side" are widely used in the apparel marketplace. In this action alone, plaintiff alleges that twelve apparel manufacturers have used these initials and phrases, in various combinations, on their own products. *See* SAC ¶ 97 (ABG); *id.* ¶¶ 112-17 (Walmart); *id.* ¶¶ 133-37 (Depop); *id.* ¶¶ 152-54 (BooHoo); *id.* ¶¶ 167-69 (Ed Hardy); *id.* ¶¶ 182-85 (J. Crew); *id.* ¶¶ 199-201 (Shop PO); *id.* ¶¶ 214-18 (Fried Rice); *id.* ¶¶ 231-35 (ASOS); *id.* ¶¶ 248-51 (Pac Sun); *id.* ¶¶ 263-65 (Bestseller); *id.* ¶¶ 276-77 (Timberland). In *Zumiez*, she made similar allegations against more than 20 defendants, all of whom allegedly infringed the same collection of marks at issue here. *See Zumiez I*, 2024 WL

5131627, at *1; *Zumiez II*, 2025 WL 2472752, at *12.[12] As noted above, many of her claims in that case were dismissed on fair use grounds. *See Zumiez I*, 2024 WL 5131627, at *1.

The widespread use of the phrases "LES" and "Lower East Side" in the marketplace prevents plaintiff from alleging that her use was "exclusive," and thus weighs against her claim that her Marks have acquired secondary meaning. *See, e.g.*, *Rockland Exposition*, 894 F. Supp. 2d at 323 (finding that the sixth factor weighed against a finding of secondary meaning where the term "Northeast" was widely used); *Gameologist Grp., LLC v. Sci. Games Int'l, Inc.*, 838 F. Supp. 2d 141, 160 (S.D.N.Y. 2011) (finding that plaintiff's use of the word "bling" was not exclusive, which weighed against plaintiff's claim of secondary meaning), *aff'd*, 508 F. App'x 31 (2d Cir. 2013); *BigStar Ent., Inc. v. Next Big Star, Inc.*, 105 F. Supp. 2d 185, 203 (S.D.N.Y. 2000) (concluding that the "substantial third party use of the 'Big Star' phrase and mark" demonstrated that "plaintiff has not achieved exclusivity"); *Spreadshirt II*, 2025 WL 1852393, at *9 (because plaintiff did not allege "that her use of the JERSEY CITY® mark was exclusive," the sixth factor "[did] not support a conclusion that the JERSEY CITY® mark has acquired secondary meaning[.]").

### 7.    Factor Balancing

In sum, of the six factors that courts in our Circuit consider when assessing whether an unregistered descriptive mark has acquired secondary meaning, plaintiff has plausibly – but weakly – alleged one and a half: sales growth (fourth factor) and length of use (part of sixth factor). Her allegations as to advertising expenditures (first factor), unsolicited media coverage (third factor), and other infringement attempts (fifth factor) are insufficient to weigh in her favor.

---

[12] In *Spreadshirt*, plaintiff alleged that five defendants infringed her mark JERSEY CITY®. *See Spreadshirt I*, 2024 WL 5057218, at *1.

Moreover, she makes no allegations at all concerning consumer surveys (second factor) or exclusivity (part of sixth factor). To the contrary, as she acknowledges, there has been widespread use of the words and phrases on which her Marks are built throughout the clothing industry,

Modest sales growth of plaintiff's entire line (which plaintiff has not, for the most part, tied to the specific Marks at issue here) and length of (non-exclusive) use are simply not sufficient to create an inference of secondary meaning in an unregistered, geographically descriptive mark. *See Hello I Am Elliot*, 2020 WL 3619505, at \*9 ("sales success alone cannot establish secondary meaning") (quoting *GeigTech E. Bay LLC*, 352 F. Supp. 3d at 284); *Spreadshirt I*, 2024 WL 5057218, at \*5 ("longstanding use alone cannot demonstrate secondary meaning" in plaintiff's alleged JERSEY CITY® mark). Plaintiff's inability to plead exclusive use of the Marks is particularly telling, given that secondary meaning "is established *only* in cases where an ordinary buyer associates the mark in question with a single source." *Erchonia*, 410 F. App'x at 418; *see also Rockland Exposition, Inc.*, 894 F. Supp. 2d at 324 (S.D.N.Y. 2012) (no finding of secondary meaning where plaintiff did not show "that the relevant consumer group has come to identify 'Northeast' with [plaintiff] as a single source of automotive-themed trade shows"). I therefore conclude that plaintiff's non-conclusory factual allegations, taken as true, fail to create a plausible inference that her LES NEW YORK®, LOWER EAST SIDE™, LOWER EAST SIDE NYC™, and LOWER EAST SIDE NEW YORK CITY™ marks have acquired secondary meaning to consumers of clothing products, which ends the inquiry under § 43(a) of the Lanham Act. *See, e.g.*, *Thompson Med. Co.*, 753 F.2d at 216 (where a plaintiff fails to allege secondary meaning, "there is no need to examine likelihood of confusion"). Accordingly, as to plaintiff's second cause of action, defendants' motions to dismiss should be granted.

42

C.        **Third Cause of Action (Pendent State Law Claims)**

Under New York common law, claims for trademark infringement and unfair competition are "virtually identical" to claims under the Lanham Act, "except that the New York common law claims require an additional showing of bad faith." *Lopez v. Nike*, 2021 WL 128574, at \*5, 14 (cleaned up) (collecting cases). Since plaintiff has failed to plead any Lanham Act claim against ABG, she has also failed to plead any New York common law claim against ABG. The same is true of her claims against Walmart with respect to Walmart T-Shirts 2-5.

Since plaintiff has adequately pleaded a Lanham Act claim against Walmart with respect to Walmart T-Shirt 1, I must consider whether she has also pleaded facts constituting bad faith as to that product. "Bad faith generally refers to an attempt by a junior user of a mark to exploit the good will and reputation of a senior user by adopting the mark with the intent to sow confusion between the two companies' products." *Star Indus.*, 412 F.3d at 388. "Where a junior user of a mark has prior knowledge of the senior user's mark and the two marks share 'similarities so strong that it seems plain that deliberate copying has occurred, [courts] have upheld findings of bad faith.'" *Lopez v. Nike*, 2021 WL 128574, at \*10 (quoting *Illinois Tool Works Inc. v. J-B Weld Co., LLC*, 419 F. Supp. 3d 382, 398 (D. Conn. 2019)). Here, plaintiff alleges that Walmart "is and was aware and had knowledge of Plaintiffs' ownership rights" in LES NYC®, in part because of her predecessor's "earlier enforcement efforts," which led to a settlement in 2017. SAC ¶¶ 127-28. She further alleges that Walmart T-Shirt 1 bears "an identical representation of Plaintiff's LES NYC® mark," and is otherwise strikingly similar to one of plaintiff's t-shirts. *Id*. ¶¶ 114-15. At this early stage of the case, these allegations are sufficient to raise an inference of bad faith. Consequently, as to plaintiff's third cause of action, ABG's motion to dismiss should be granted, and Walmart's

43

motion to dismiss should be granted as to Walmart T-Shirts 2-5, but denied as to Walmart T-Shirt 1.

### D.       Fourth Cause of Action (Contributory Infringement)

As to defendant Walmart only, plaintiff alleges – seemingly in the alternative – that "[t]o the extent that Defendant Walmart attempts to shift its infringement liability to its third party account sellers that offer and sells [*sic*] clothing products via the www.walmart.com website, Walmart is still liable for contributory trademark infringement as it has knowingly continued to supply services to its third-party account sellers that it knows are infringing my LES™, LES NYC® and LOWER EAST SIDE™ marks that Walmart was aware of from the earlier trademark dispute with my predecessor regarding some of the same marks that are the subject of the current action." SAC ¶ 124. Plaintiff does not allege any additional facts in support of her secondary liability theory.

To state a claim for contributory trademark infringement, a plaintiff must allege facts showing that the defendant "intentionally induce[d] another to infringe a trademark," or "continues to supply its [service] to one whom it knows or has reason to know is engaging in trademark infringement[.]" *Tiffany (NJ) Inc. v. eBay Inc*., 600 F.3d 93, 106 (2d Cir. 2010) (quoting *Inwood Lab'ys, Inc. v. Ives Lab'ys, Inc.*, 456 U.S. 844, 854 (1982)). Moreover, to state a claim under this theory, the plaintiff must demonstrate that the defendant service provider had "more than a general knowledge or reason to know that its service is being used to sell" infringing goods. *Id.* at 107 (requiring "[s]ome contemporary knowledge of which particular listings are infringing or will infringe in the future").

Here, plaintiff does not allege that Walmart took any specific acts that could constitute intentional inducement. *See Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.*, 206 F. Supp. 3d

44

869, 905 (S.D.N.Y. 2016) ("Intentional inducement requires specific acts undertaken with knowledge of infringing behavior and with intent to cause infringement."). Nor does she allege that Walmart had "contemporary knowledge" of any "particular listings" by third parties that infringed her Marks. Instead, plaintiff alleges in vague and conclusory terms that Walmart "allows [unidentified] third party sellers to promote, offer and sell clothing products via its website." SAC ¶ 110. Moreover, Walmart has *not* "attempt[ed] to shift its infringement liability to its third party account sellers." *Id.* ¶ 124. In particular, it makes no claim that any third party is responsible for the appearance of Walmart T-Shirt 1 on its website. Consequently, plaintiff's fourth cause of action should be dismissed. *See Spreadshirt II*, 2025 WL 1852393, at *13 (dismissing Reveron's nearly identical claim for contributory infringement against Walmart, in connection with her JERSEY CITY® mark, because she made "no concrete allegations that Walmart 'was ever made aware of any specific allegedly infringing conduct by any alleged infringer in connection with [its] services prior to this action.'") (alteration in original) (quoting *Lopez v. Bonanza.com, Inc.*, 2019 WL 5199431, at *15 (S.D.N.Y. Sept. 30, 2019)).

###    E.    Leave to Amend

Finally, "in a cursory sentence on the last page" of her opposition declarations, "without any justification or an accompanying suggested amended pleading," *In re Ferrellgas Partners, L.P., Sec. Litig.*, 2018 WL 2081859, at *20 (S.D.N.Y. Mar. 30, 2018), *aff'd*, 764 F. App'x 127 (2d Cir. 2019), plaintiff requests that she be granted a third opportunity to amend her complaint. *See* Pl. Walmart Decl. ¶ 26; Pl. ABG Decl. ¶ 29. Nowhere in her papers, however, does plaintiff suggest what more she could plausibly allege to cure the defects identified above. There is thus no reason to believe that a further amendment would be anything but futile. *See In re Ferrellgas Partners, L.P., Sec. Litig.,* 2018 WL 2081859, at *20 (noting that denial of leave to amend is

appropriate under such circumstances, and collecting cases); *accord Spreadshirt I,* 2024 WL 5057218, at *6 (S.D.N.Y. Nov. 19, 2024) ("Secondary meaning evidence on consumers' perception of . . . [each] mark is within Plaintiff's knowledge and control; it would not be something that Plaintiff[] would expect to obtain from Defendants in discovery.").

Moreover, plaintiff has already had two opportunities to amend – after Walmart moved to dismiss her Complaint and her First Amended Complaint (*see* Dkts. 9, 30) – and has had significant experience litigating similar claims in other cases. Litigation is not "an interactive game" to be played indefinitely, "until a viable complaint emerges." *Masters v. Wilhelmina Model Agency, Inc.*, 2003 WL 1990262, at * 4 (S.D.N.Y. Apr. 29, 2003). Rather, "[i]t is the plaintiff['s] responsibility to plead [her] case adequately, and a court may deny [her] leave to replead when [she] has – as here – been given ample prior opportunity to allege a claim." *In re Refco Cap. Markets, Ltd. Brokerage Customer Sec. Litig.*, 2008 WL 4962985, at *2 (S.D.N.Y. Nov. 20, 2008) (internal quotations and citation omitted), *aff'd sub nom. Cap. Mgmt. Select Fund Ltd. v. Bennett*, 680 F.3d 214 (2d Cir. 2012). Here, plaintiff has been given "ample prior opportunity," and makes no showing that yet another opportunity is warranted. *See, e.g.*, *Taveras v. UBS AG*, 612 F. App'x 27, 29-30 (2d Cir. 2015) (summary order) (affirming denial of leave to amend where plaintiff previously "amended [her] complaint twice"); *Wilson v. Mid-Hudson Forensic Psychiatric Ctr.*, 2025 WL 1295655, at *12 (S.D.N.Y. May 5, 2025) (denying leave to amend where plaintiff had "already amended twice," after "having the benefit of pre-motion letters from Defendants") (internal record citations omitted); *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 242 (S.D.N.Y. 2005) (denying leave to amend where plaintiffs already had "two opportunities to cure the defects in their complaints").

## F.      Filing Injunction

In its motion to dismiss, Walmart suggests that a filing injunction would be appropriate to prevent plaintiff from pursuing "vexatious litigation." Walmart Mem. at 5. Because I have found that two of plaintiff's claims are well-pleaded – as to one product – there is no basis for such an injunction.

## IV.     CONCLUSION

For the reasons set forth above, I recommend, respectfully, that ABG's motion to dismiss be GRANTED, and that Walmart's motion to dismiss be GRANTED and DENIED IN PART, as follows:

1.  The first cause of action should be dismissed except as to Walmart T-Shirt 1.

2.  The second cause of action should be dismissed entirely.

3.  The third cause of action should be dismissed except as to Walmart T-Shirt 1.

4.  The fourth cause of action should be dismissed entirely.

Dated: New York, New York
       March 19, 2026

_____
**BARBARA MOSES**
**United States Magistrate Judge**

## NOTICE OF PROCEDURE FOR FILING OF OBJECTIONS
## TO THIS REPORT AND RECOMMENDATION

The parties have 14 days from this date to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), unless they receive this Report and Recommendation solely by mail, in which case they have 17 days from the date on which it was mailed. *See* Fed. R. Civ. P. 6(a), 6(d). Any objections must be filed with the Clerk of the Court, addressed to the Hon. Valerie E. Caproni, and delivered to Judge Caproni in accordance with her individual practices. Any request for an extension of the deadline to file objections must also be directed to Judge Caproni. Failure to file timely objections will result in a waiver of such objections and will preclude appellate review. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Frydman v. Experian Info. Sols., Inc.*, 743 F. App'x 486, 487 (2d Cir. 2018) (summary order); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).